Filed 11/18/22  Conservatorship of Y.B. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| Conservatorship of the Person of Y.B. | |
| PUBLIC GUARDIAN OF CONTRA COSTA COUNTY, | A162550 |
| Petitioner and Respondent, | (Contra Costa County Super. Ct. No. MSP13-01485) |
| v. | |
| Y.B., | |
| Objector and Appellant. | |

Y.B. appeals from the Contra Costa County Superior Court's order reappointing the Public Guardian of Contra Costa County (Public Guardian) as her conservator under the Lanterman-Petris-Short (LPS) Act (Welf. & Inst. Code, § 5350 et seq.). Her counsel has submitted a brief in which he does not identify any arguable issues and asks this court to conduct an independent review of the record. Counsel advised Y.B. of her right to file a supplemental brief within 30 days of the opening brief's filing, but Y.B. has not done so.

When a similar appellate brief is filed in a criminal appeal, we must conduct an independent review of the record to determine if it reveals any

1

arguable issues. (*People v. Wende* (1979) 25 Cal.3d 436, 441–442.) This duty does not extend to appeals from conservatorship proceedings. (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529, 535.) Rather, upon the filing of an appellate brief that does not identify any arguable issues and the allowance of time for the appellant to file a supplemental brief, we may dismiss such an appeal on our own motion. (*Id.* at p. 544 & fn. 6.) We shall do so here.

## BACKGROUND

In February 2021, the Public Guardian filed a petition seeking reappointment as Y.B.'s LPS conservator, alleging that Y.B. remained gravely disabled and unable to provide for her own basic needs as a result of a mental health disorder. The Public Guardian recommended the imposition of special disabilities that would deny Y.B. the right to refuse or consent to treatment related to her grave disability, the right to enter into contracts without the knowledge and consent of the conservator, and the privilege of possessing a driver's license, and would disqualify her from purchasing or possessing firearms or other deadly weapons.

Y.B., through her appointed trial counsel, objected to the reappointment and requested a bench trial. The court advised Y.B. of her right to a jury trial and accepted her waiver of that right. It also ordered the petition merged with the February 2020 petition for reappointment, which had not been heard yet because of the COVID-19 pandemic.

At the bench trial, Dr. Michael Levin, a psychiatrist employed by Contra Costa County, including to conduct grave disability evaluations for the county's conservator's office, testified as an expert on behalf of the Public Guardian. He said he had met with Y.B. "a number of times" dating back to 2014 and had interviewed her over Zoom for thirty minutes the day before he

2

testified.  Y.B. made "accusatory statements" about staff and peers at her placement at California Psychiatric Transitions (CPT) that Dr. Levin thought indicated a "problem with reality testing," and "paranoid ideation."  For example, Y.B. said, " 'All they do is rape and assault me,' " and, " 'They treat me bad here.' "  She also had an unfounded, "ongoing fixed idea" about a carton of cigarettes being taken from her.

Asked about Y.B.'s problem with reality testing, Dr. Levin said Y.B. told him the CPT staff was trying to starve her, and that their bad treatment of her was racist in nature.  When asked about her plan if she left her placement, she said she wanted to go back to her home area with no specific place in mind and later said she wanted to go to a court hearing, be put on a "5150" hold, be taken to a medical center and then released to her home area.  Her plans struck him "as being out of touch with reality," and indicated she was unable "to make a concrete defined plan for where she would go."

Dr. Levin testified that CPT records indicated that Y.B. exhibited a number of difficulties related to mental illness.  She talked to herself, including saying " 'to no one in particular . . . "fuck that shit" ' " and " ' "[g]et out of my way," ' " indicators that she was responding to internal stimuli or auditory hallucinations, which was a "psychotic symptom."  She made delusional statements, including that she was pregnant and due in three months and that someone stole her baby.

Y.B. also had difficulty engaging in daily living activities.  For example, she required "numerous prompts to wash her body appropriately."  She refused her medications and slammed her room door on CPT staff in one incident, and she hid pills.

Also, Y.B. had issues with "impulsivity—appropriateness of behavior" that indicated "a general lack of reality testing and appropriate behavior."

For example, she grabbed a staff member's hand repeatedly despite efforts to redirect her behavior and pinched a staff member's buttocks.

Dr. Levin opined that Y.B. suffered from schizophrenia. She was taking medications for it, but she did not understand them or know their names. She "lack[ed] insight into her illness and lack[ed] the capacity really to form the very cogent plan for taking care of herself were she not in this kind of facility." He concluded that she was gravely disabled.

Deborah Tyler, the deputy conservator assigned to Y.B. since 2014, testified that she visited or spoke to Y.B. every two months. In the previous year, she observed that Y.B. had expressed "many" fixed false beliefs and delusions, including that she had a baby and lots of money. She frequently said she had been released from all felony charges and should therefore be released from the conservatorship, although Tyler explained to her repeatedly that her conservatorship was not related to any criminal charges. She said she had multiple children in Richmond, a job, and a boyfriend, and she needed to "get back"; Tyler, despite "considerable research," had not found proof of these people. Y.B. claimed to have a place to stay other than CPT, but would not provide information about it.

Y.B. took the stand and began reading and saying things that were muddled. To the extent discernible, her statements included remarks that that "they" cut her hair, abused her, starved her, and hit her breast. She referred to a "one year charge for a gun felony." She said she was "better now," asked to be released to her house, said she was not safe at her current placement, and asked to be transferred to a hospital for three days and then released.

The trial court found beyond a reasonable doubt that Y.B. was gravely disabled and that her existing placement was the least restrictive and most

4

appropriate placement, imposed what were in essence the recommended special disabilities and granted the petition reappointing the Public Guardian as Y.B.'s conservator.  Y.B. filed a timely notice of appeal from the court's order.

Given our decision to dismiss this appeal, we will not analyze the record other than to note that we likely would find no arguable issues and affirm even if we were to conduct an independent review of it based on the evidence we have summarized.

## DISPOSITION

The appeal is dismissed.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
GOLDMAN, J.

5